FELIX YOUSSOUPOFF, Plaintiff, v. JOSEPH E. WIDENER, Defendant.

Supreme Court, New York County, September 14, 1925.

Contracts — construction — contract negotiated by parties in London for transfer of oil paintings from plaintiff to defendant is English contract — fact that defendant executed contract in Philadelphia and repurchase of paintings was to be made in that city, does not make contract Pennsylvania contract — contract states plaintiff " sold and delivered " said paintings to defendant at specified price and gives plaintiff right to repurchase at purchase price plus interest — contract which gives defendant right to repurchase from plaintiff within ten years thereafter on same terms is one of sale and repurchase, and not chattel mortgage — provision in said contract giving defendant right to repurchase paintings within ten years of plaintiff's repurchase should plaintiff care to dispose of them is valid — action by plaintiff for specific performance of contract — pledge of said paintings by plaintiff to secure loan obtained to repurchase paintings violates contractual obligations to defendant — complaint dismissed.

A contract negotiated by plaintiff and defendant in the city of London relating to the transfer by the plaintiff to the defendant of two original oil paintings by Rembrandt, is an English contract and should be interpreted by the English law, since it appears that, though it was signed by the defendant in Philadelphia, all the negotiations leading up to its execution were conducted in London, that the pictures were delivered and the money paid there, and that the contract was actually signed there by plaintiff. The fact that the contract permitted repurchase by the plaintiff in Philadelphia under certain conditions does not make the contract a Pennsylvania contract.

Said contract executed in the manner stated must under English law be construed as a contract of sale and repurchase and not as a chattel mortgage, since it appears that said contract states that the plaintiff " sold and delivered " to defendant said paintings for £100,000, which was a fair price under the circumstances existing at the time, and gives to plaintiff the privilege of repurchasing the same at Philadelphia at the purchase price, plus eight per cent interest to the date of repurchase, upon condition that within three years plaintiff's financial condition permits said repurchase for his personal use, said privilege

to be exercised only in case plaintiff finds himself in a position again to keep and " personally enjoy these wonderful works of art," and that in the event of repurchase plaintiff would resell said paintings to defendant at the gross sum paid to defendant, if at any time within ten years after said repurchase, plaintiff or his representatives should care to dispose of them. The conditions of said contract are valid and must be strictly complied with by plaintiff before his right to repurchase is perfected.

Plaintiff's complaint in an action for specific performance of said contract upon the theory that said contract is a mortgage, should be dismissed on the merits, where it appears that plaintiff in obtaining a loan from a third person in order to repurchase said paintings executed a note to said third person and gave the paintings as a pledge therefor, with the right to sell the paintings in the event said note was not paid, since said pledge made it possible for the paintings to pass into the hands of a third person without notice of defendant's rights, thus rendering plaintiff incapable of performing his contract with defendant in reference to a subsequent repurchase by defendant and evidencing a disregard of his contractual obligations to defendant. ·

ACTION for specific performance of contract claimed to be mortgage.

*Root, Clark, Howland & Ballentine* [*Clarence J. Shearn* and *Leo Gottlieb* of counsel], for the plaintiff.

*Miller & Otis* [*Nathan L. Miller* and *H. Bartow Farr* of counsel], for the defendant.

DAVIS, J. In July, 1921, the plaintiff was the owner of two original oil paintings by Rembrandt, known respectively as " A Gentleman with a High Hat, his Gloves in his Left Hand," and " A Lady with an Ostrich Feather Fan in her Right Hand."

These paintings had been in the ownership of the plaintiff's family for many years and were regarded as precious heirlooms. They are the product of the best period of Rembrandt's work, and it is claimed that they have a great intrinsic value. On the issue of the market value it is in evidence that Sir Joseph Duveen offered £150,000 for them in February, 1921. He testified that during the six months preceding February, 1921, he was negotiating for the pictures, and was anxious to get them at that price. Other offers to buy these portraits were made in preceding years at prices ranging from £100,000 to £110,000. Other competent experts testified that in June, July and August, 1921, their market value was about £100,000.

In June, 1921, the plaintiff, then residing in Paris, sought the defendant as a possible purchaser of the pictures in question. Through a Mr. Wickfeld an appointment was made for plaintiff and defendant to meet in London on June twenty-fourth, at the residence of plaintiff's friend, Baron de Zuylen, 8 Carlos Place W. At that time plaintiff's finances were in a very critical condition,

and he was stopping at the residence of Baron de Zuylen pending his attempts to raise money from a sale or pledge of his Rembrandts.

Plaintiff did not keep the engagement personally, but sent his intimate friend, Captain Maziroff, to represent him. In explanation of his absence plaintiff wrote the defendant before the day of the appointment: " * * * my friend, Mr. Maziroff, who attends to all my affairs here and has sole charge of the disposal of my pictures, will come to see you as arranged and give you all details. I have asked him to give you every facility in dealing with this matter, so as to dispose of the high charges made by dealers. I have arranged that you can see the pictures, which are ·deposited in the City, any time at your convenience to-morrow * * *."

Pursuant to the appointment Widener and Maziroff met on June twenty-fourth. The interview was short. Prices were discussed, but no agreement resulted, the parties being very far apart as to the money value of the paintings. The evidence on both sides shows that the chief subject then under discussion was an absolute sale of the pictures.

Maziroff having reported his interview to the plaintiff, the latter wrote the defendant on June 29, 1921, as follows:

" DEAR MR. WIDENER.— I have just heard from Maziroff your conversations with him.

" Many thanks for your warning against dealers and their transactions. You quite understand through Maziroff's explanations, that the dealers' statements are far from just. This, therefore, has decided me to treat only direct with prospective purchasers.

" Appreciating the sympathy you expressed with my poor country, I take the liberty in making you two proposals, which if on principle, you could give consideration to, I should be only too pleased to discuss in details with you, on your return to London.

" The first is: A loan as mortgage on the pictures, which latter you would take with you to America as guarantee, with option to purchase later, when the financial outlook will have again become established.

" The second is: A conditional sale at a sum by mutual agreement, you having the right, should you decide later this purchase price was exaggerated, that I shall be bound to repurchase the pictures from you, at the same price you paid; at a future date by personal agreement * * *.

" Sincerely yours,
                    " PRINCE F. YOUSSOUPOFF."

In answer to this letter Mr. Widener wrote on July first from Paris as follows:

Supreme Court, September, 1925. [Vol. 126

" Dear Sir.— * * * Your pictures naturally have great value, tho' I fear you have an exaggerated opinion on this subject. I have in my collection ten paintings by Rembrandt, some of greatest importance, so naturally it isn't to my interest to undervalue the works by this great master — but I can assure you there has never been a time, when money was plentiful, which isn't the case now, when your two pictures would have brought more than one hundred thousand pounds, which would have been a record price for a portrait by Rembrandt, as I have never known one to have sold for more than forty-five thousand pounds.

" I know that very recently the dealers were scheming thru some loan to get these pictures away from you for about forty-two thousand pounds, which would have strained them, even at that figure. Today, you know, as I do, that there is no money for investment in art.

" Dealers are all over extended with loans and large stocks of pictures, so your market appears limited to some private collector. I expect to arrive in London, at the Ritz, on July 10th for a couple of days visit, and will be glad to discuss the matter with you that evening after eight o'clock, or at another time mutually agreeable.

" Should you arrive at a realization of the present market value of your pictures, I will be glad to entertain their purchase, tho' raising the necessary cash wouldn't be any more convenient for me at this time, than for most other people * * *."

On July 4, 1921, Prince Youssoupoff in answer to Mr. Widener's letter wrote suggesting that Mr. Widener examine the pictures before discussing the matter and expressing his dissent from the latter's judgment of their value — asserting that the dealers had formed a ring against him and were designedly undervaluing the pictures to prevent private purchasers from dealing direct with him. He also refers to an offer of £150,000 made by a big dealer. The Prince closes his letter as follows: " Realizing the difficult financial situation of today, I should like to entertain any proposition to afford you every opportunity to secure these pictures by mutual concessions, such as I wrote you in my last letter, after you have seen the pictures as I suggest," and proposed a meeting for July eleventh. It was arranged by wire to meet on July twelfth at the Ritz Hotel in London. Widener and Maziroff met at the Ritz on the day appointed and went together to the safe deposit company's office where the pictures were stored. The Prince was there waiting for them, and after the defendant had examined the paintings, all three returned in a taxicab to the Ritz. It is a fair inference from their conversation in the cab that the parties had in mind an absolute sale of the pictures to Widener, but that they were

far apart on the price, the Prince asking £200,000 and Mr. Widener willing to pay not more than £100,000.

Finally a result was reached in the form of a thirty-day option to Widener. The weight of evidence favors the plaintiff's claim to the extent that this document was composed in the main part by Widener. It follows:

"8 Carlos Place
"London, W.

"I the undersigned Prince F. Youssoupoff agree upon receipt of one hundred thousand pounds from Mr. Joseph Widener within one month from today to sell to him my two well known Rembrandt portraits. Reserving the option of purchasing them back from him, on, or, any time before January 1st, 1924, for the same sum, plus eight per cent interest from date of purchase.

"July 12th,                    PRINCE FELIX YOUSSOUPOFF.
     1921."

The plaintiff's claim is that the next word from Widener was in the form of a cablegram received by plaintiff on August ninth after nine-fifty-two P. M. in London, reading as follows:

"Cosyle —
"Audley —
"London.
"Please communicate with my agent Sulley who has money to take delivery.                    WIDENER."

One of the plaintiff's contentions is that these two documents, the proposal of July twelfth and the cablegram, constitute an enforcible contract; and in his complaint he demands judgment declaring that the documents constitute a chattel mortgage of the two paintings as security for a loan of £100,000 made by defendant to plaintiff, and that plaintiff be permitted to redeem the paintings upon payment of £100,000 with interest at eight per cent per annum from August 1, 1921, to the date of the tender made December 13, 1923; or, in the event that the court shall decide that said documents do not constitute a chattel mortgage, that defendant be directed to specifically perform the contract evidenced by the said two documents (the option of July twelfth and the cablegram of August ninth) by delivering to plaintiff the said paintings upon payment of £100,000 with interest thereon at eight per cent per annum from August 1, 1921, to the date of the tender by plaintiff.

Whether the two documents in question constitute a contract between these parties depends upon the conclusion to be drawn in the light of other evidence now to be considered. The defendant

claims that the cablegram of August ninth had no relation to the proposal or option of July twelfth, but that he sent it immediately after he had received a cablegram from the plaintiff accepting a proposed contract as drawn by Widener's lawyer in Philadelphia, and afterwards executed by the plaintiff on August twelfth. In other words, the defendant claims that the only contract made by him with the plaintiff is the one dated August 12, 1921. It happens that when Widener returned to Philadelphia with the option of July twelfth, he was able to raise the necessary £100,000. His attorney then drew up a proposed contract in duplicate, one of which Widener executed and inclosed in a letter, dated July twenty-fifth, to his agent, Sulley, in London. In his letter to Sulley Widener writes: " I am enclosing you copy of letter which I am sending off to Youssoupoff together with the contract which I have had drawn up in legal form. They both explain themselves to you. Immediately I hear from Youssoupoff if acceptable to him, I will deposit £100,000 to your order in London and so notify you by cable, when you will arrange to take possession and immediately cover by insurance   *   *   *."

Defendant also mailed a copy of the proposed contract to the plaintiff with a letter dated July twenty-fifth (Exhibit 13) in which defendant writes: " *   *   *   if the inclosed copy of agreement of sale is acceptable to you I will ask you to cable, ' Widener, Philadelphia. Contract acceptable. Youssoupoff,' when I will arrange for my personal and confidential personal representative, Mr. Arthur Sulley, 159 Bond Street, to pay you the money and take delivery." The letter to Sulley and the letter to Youssoupoff were mailed at the same time, at Philadelphia, on July 25, 1921, at five P. M. (Postmark on letter to Sulley Ex. P. P.)

The plaintiff testified that he received the cablegram of August ninth from defendant two days in advance of the receipt of defendant's letter of July twenty-fifth inclosing the proposed contract. If such be the fact, there was sufficient reason for plaintiff to infer that Widener had raised the money to complete the transaction and that his cablegram of August ninth was an acceptance of the proposal of July twelfth.

Plaintiff states that he received the defendant's letter of July twenty-fifth, inclosing the proposed contract drawn by Widener's attorney, on August eleventh. In this statement he is supported by the testimony of Maziroff. Winner, the secretary of Widener, testified that he mailed this letter to the Prince the same time he mailed a similar letter to defendant's agent Sulley. The latter was mailed at Philadelphia at five P. M. July 25, 1921. (Postmark on letter to Sulley Ex. P. P.) If the plaintiff states correctly the

date on which he received this letter of July twenty-fifth, it took sixteen or seventeen days for the letter to reach its destination in London.    Notwithstanding, the attendant circumstances appear to me to show that they are mistaken as to the order in which the two communications came into the hands of the Prince.    It is in evidence that the steamship *America* sailed from New York July 26, 1921, with mail for England, that the mail for this ship closed at eleven A. M. on the twenty-sixth, and that the mail for London arrived in London at six-fifty A. M. on August fourth.    The next mail ship from New York was the *Mongolia.*    It sailed July 28, 1921.    Its mail closed at eight A. M. on that day, and arrived in London at twelve-twenty A. M., August seventh.    The next ship to take mail to England was the *Centennial State* (now the *President Adams*).    It sailed July 30, 1921, and its mail was delivered to the London post office August 9, 1921, at five-fifty A. M.    It is also in evidence that in the ordinary course of mail, a letter mailed in Philadelphia, postmarked Philadelphia, Penn., July 25, 1921, five P. M., addressed to London, Eng., would have gone forward by the *America,* sailing July 26, 1921.

But the plaintiff claims that the mails did not arrive in London in due course and that the presumption arising from the course of the mails cannot survive in the presence of the testimony of the plaintiff and Maziroff that they did not arrive until August eleventh, two days after the receipt of defendant's cablegram. Plaintiff cites *Rosenthal* v. *Walker* (111 U. S. 185); *Henderson* v. *Carbondale C. & C. Co.* (140 id. 25); *Christensen Engineering Co.* v. *Westinghouse Air B. Co.* (135 Fed. 774).

In the cases cited the question was whether or not certain mailed communications had been received by the addressee in due course. In *Rosenthal* v. *Walker* the court says that a properly addressed letter mailed in the usual way is presumed to have reached its destination and addressee at the regular time, and cites *Huntley* v. *Whittier* (105 Mass. 391, 392), where the court says, referring to this presumption, that when it " is opposed by evidence that the letter was never received, must be weighed, with all the other circumstances of the case, by the jury, in determining the question whether the letter was actually received or not."    To the same effect are the other cases cited by plaintiff (*supra*).    In the present case the receipt of the letter is admitted; the date of its receipt is disputed.    Applying the rule of the above-cited cases to determine the date on which Widener's letter of July twenty-fifth was received by plaintiff, I conclude that it reached its destination in due course and was received by plaintiff before his receipt of the cablegram

32

Supreme Court, September, 1925. [Vol. 126

of August ninth. The following are some of the circumstances and considerations which point to the correctness of this conclusion:

Widener claims that the cablegram of August ninth was sent by him after he had received a cablegram from the plaintiff accepting the proposed contract mailed to him on July twenty-fifth. In his letter of July twenty-fifth to the plaintiff Widener wrote: " If the inclosed copy of agreement of sale is acceptable to you, I will ask you to cable ' Widener, Philadelphia. Contract acceptable. Youssoupoff,' when I will arrange for my personal and confidential representative, Mr. Arthur Sulley, 159 New Bond Street, to pay you the money and take delivery."

It is reasonable to infer from Widener's letter that the proposed transaction would not go through until plaintiff had cabled his acceptance of the contract as requested. Winner, the personal secretary of defendant, testified in effect that he received a certain cablegram on August ninth; that he regarded it as an acceptance of the proposed contract by plaintiff as requested in defendant's letter of July twenty-fifth, and that on receiving the cablegram he mailed it to Widener at Saratoga and proceeded at once to carry out the previously given orders of Widener by sending the £100,000 to Sulley in London (See Exhibit OO) on August ninth. On these points Winner's testimony remained unshaken, and I take it as true.

On the same day (August ninth) Sulley received a cablegram from Widener as follows:

" My proposition accepted. One hundred thousand pounds deposited your order Morgan Grenfell. Please cable when closed.
" WIDENER."

On the same day (August ninth) he also sent the cable received by plaintiff on August ninth referred to above, in which plaintiff was told to communicate with Sulley " who has money to take delivery."

The defendant, under objection of the plaintiff, was not permitted to state the contents of the cablegram received by his secretary, Winner, on August ninth. Defendant testified that the cablegram had been destroyed, and at the trial there was no evidence connecting the plaintiff with its transmission. But, in view of the fact that plaintiff could not remember whether or not he had sent a cablegram to the defendant on the ninth of August accepting the contract as proposed, and the positive statement of Widener and Winner that the transaction was started forward immediately upon receipt of a certain cablegram, and of the additional fact that the proposed contract was actually executed by the Prince on August twelfth, I feel constrained to find that

the plaintiff did in fact accept the proposed contract by cable and that Widener's cablegram of August ninth sent by defendant was received by the plaintiff after his acceptance had been received by Widener.

It is my opinion, therefore, that Widener's cablegram of August ninth bore no relation to the option of July twelfth, and that the only contract between the parties is the one dated August 12, 1921.

Plaintiff alleges that he executed the contract of August twelfth under duress used by defendant; that the defendant took advantage of his necessitous condition and coerced him to execute and deliver the document under a threat wrongfully to withhold the £100,000 the plaintiff then greatly needed and which the defendant had agreed to pay.

The evidence fails to show any duress whatever. On the contrary, the plaintiff executed the contract after consultation with his lawyer and Maziroff, his man of business, and, in return therefor, received £100,000 from defendant's agent. It was his deliberate act and he is bound by it. That he was dissatisfied with some of the provisions of the contract is undoubted. This appears from his letter of August fourteenth to Widener, in which he makes an appeal for certain modifications of the contract as executed. As the appeal went unheeded, this episode has little bearing on the issues here.

The contract as executed by the parties on August twelfth and, with reference to which this controversy must be decided, is as follows:

" *Memorandum of Sale by Prince Felix Youssoupoff, of Russia, to Joseph E. Widener, of Philadelphia.*

" Prince Youssoupoff has this day sold and delivered to Mr. Widener his two well-known Rembrandt portraits of a man and a woman which are illustrated and described in the Bode catalogue for the price or sum of One hundred thousand pounds (£100,000), and has received the full purchase money. Title to the said pictures has passed to Mr. Widener and he accepts delivery of the same.

" Mr. Widener recognizes that Prince Youssoupoff would not have parted with these wonderful pictures for any consideration had it not been for the unhappy plight which has fallen upon him and his countrymen due to the dreadful revolution in Russia, and recognizing the very proper and deepseated wish of Prince Youssoupoff to repossess himself of these pictures in case the present terrible conditions in Russia should readjust themselves within a reasonable time, Mr. Widener grants to Prince Youssoupoff the right and privilege to be exercised on or before January 1, 1924, and not thereafter, of repurchasing these pictures at the purchase

price, One hundred thousand pounds (£100,000) plus eight per cent. (8%) interest from this date to the date of repurchase; the repurchase to be made in the City of Philadelphia and the pictures to be redelivered to Prince Youssoupoff upon payment of the full purchase money.

" This privilege is a purely personal one granted to Prince Youssoupoff in recognition of his love and appreciation of these wonderful pictures.   It is not assignable nor will it inure to the benefit of his heirs, assigns or representatives and Prince Youssoupoff represents that this privilege of repurchase will be exercised only in case he finds himself in the position again to keep and personally enjoy these wonderful works of art.   It is, therefore, agreed that if the repurchase should be made by Prince Youssoupoff, it will be made only under and subject to conditions to be at that time properly stipulated, that the title to the said pictures then acquired by Prince Youssoupoff will be subject to the right in Mr. Widener or his representatives to take back the pictures upon the payment to Prince Youssoupoff or his representatives of the gross sum which Prince Youssoupoff has paid to Mr. Widener in case Prince Youssoupoff or his representatives should at any time within ten (10) years after the date of the said repurchase wish to dispose of the same, which right may be enforced by Mr. Widener against any party into whose possession the pictures may have come in any manner in contravention to the reserved right of Mr. Widener.

" Mr. Widener will of course take every precaution to preserve and, protect these wonderful works of art, but if for any reason they should be damaged or destroyed or Mr. Widener not be in a position to carry out the resale of the same on or before January 1, 1924, no personal liability shall attach to him in the premises.

" *In Witness Whereof* this paper having been previously executed by Mr. Widener and left with his representative in London, has also been executed by Prince Youssoupoff and delivery made between the parties at London this 12 day of August, 1921.

" PRINCE F. YOUSSOUPOFF.

" Signed in the presence of:
  " O. T. RAYNER,
    " J Kings Bench Walk,
      " Inner Temple,
        " London E. C. 4."

Such being the contract, by what law shall it be interpreted and its effect be determined — by Pennsylvania law as contended by the plaintiff, or by English law as urged by defendant?   The plaintiff takes the position that the contract is a mortgage whether it be judged by English law or Pennsylvania law.   The defendant

claims that the contract is a sale under the English law with certain valid conditions of repurchase.

Our first inquiry is, what law both parties intended should govern their transaction as disclosed in the language of the contract. In *Hamlyn & Co.* v. *Talisker Distillery* (L. R. [1894] App. Cas. 202), in the House of Lords, approved in *Wilson* v. *Lewiston Mill Co.* (150 N. Y. 314), Lord HERSCHELL said: " The whole of the contract must be looked at and the rights under it must be regulated by the intention of the parties as appearing from the contract." The question of intention " must be determined with reference to the facts and circumstances surrounding the parties in each case presented, and the intention of the parties so far as it is disclosed must control. The place where the contract is accepted is important. It fixes the time that the minds of the parties met and the contract consummated. It does not, however, necessarily determine the place, or the law under which the contract must be executed. So, also, is the place important where the contract was talked over, and its substantial details arranged. Yet this, standing alone, may not control, for the place in which the contract is to be executed is of equal importance in determining what must have been the intention and purpose of the parties. The *lex loci solutionis* and the *lex loci contractus* must both be taken into consideration, neither of itself being conclusive, but the two must be considered in connection with the whole contract, and the circumstances under which the parties acted in determining the question of their intent." (*Wilson* v. *Lewiston Mill Co.*, 150 N. Y. 314, 323.)

The contract between the plaintiff and defendant was consummated in London on August 12, 1921. The pictures were delivered there and the money paid there. It states that the pictures were sold and delivered to Widener by the plaintiff for the purchase price of £100,000 and that title passed to Widener. The contract then gives the Prince the right to repurchase on or before January 1, 1924, at the price of £100,000 plus eight per cent interest to the date of repurchase, the repurchase to be made in Philadelphia. But the right to repurchase is conditioned upon the Prince finding himself in the position again to keep and personally enjoy the portraits. The title of the plaintiff acquired on his repurchase is qualified by a right of pre-emption given to Widener or his representative upon payment of the gross sum paid by the Prince in case the latter, or his representatives, should wish at any time within ten years after his repurchase to dispose of the paintings.

Plaintiff contends that in determining the legal effect of this contract the law of Pennsylvania governs because it was the intention of the parties that the paintings should be removed to

Philadelphia and there retained and because the repurchase by the plaintiff was to take place in Philadelphia.

The plaintiff argues, as I understand his position, that this provision settles conclusively that Pennsylvania law should govern. He attaches little, if any, weight to the fact that the contract was agreed to and signed in London, the money paid and the pictures delivered there. But the rule approved in *Wilson* v. *Lewiston Mill Co.* (*supra*) recognizes that the place where the contract was signed and the place of performance have equal claims to consideration in searching for the intention of the parties, and for this purpose the court should examine also " the circumstances under which the parties acted."

Another circumstance to be considered is that the contract specifies no place of performance for the " taking back " by Widener in case the defendant should wish to sell during the ten-year period.

We have, therefore, London as the place of the execution of the contract, Philadelphia the place where the repurchase by the plaintiff was to be made, if made at all, and no place designated for the possible repurchase by defendant during the ten-year period.

Plaintiff would have the question of the intention as to the controlling law turn conclusively upon the fact that the contract states that the repurchase was to be made in Philadelphia. The general rule is stated in *First National Bank of Toledo* v. *Shaw* (61 N. Y. 283, 293), " * * * where a contract is made in one country and to be performed in another, it is not always easy to determine, according to the authorities, whether the interpretation of words is to be governed by the law of the place where the contract is made, or by that where it is to be performed. The general principle is, that the law of the place where the contract is made is to govern, unless it is positively to be performed elsewhere. The fact that acts are to be done abroad under a contract does not necessarily make it a contract to be performed there, in a legal sense." The mere fact that the repurchase was to be made in Philadelphia does not necessarily make this a Pennsylvania contract. To so hold, would be to ignore the important circumstances that all the details of the contract were discussed and agreed upon in London; that the place of Widener's repurchase within the ten years' period is presumed to be England (*Stumpf* v. *Hallahan*, 101 App. Div. 383; affd., 185 N. Y. 550), and that this contract was signed in London. As argued by the defendant, I think that the sale, the payment of the consideration, the delivery of the paintings, and the qualified privilege of repurchase granted first to the plaintiff and thereafter to the defendant are the essential parts of

the contract, and that the designation of Philadelphia as the place of the plaintiff's repurchase is incidental and was inserted in the contract as being the most convenient method of transacting that part of the business. (*Staples* v. *Nott*, 128 N. Y. 403.)

In my opinion it was not the intention that one part of this contract should be governed by Pennsylvania law, and another part by English law, but that the parties regarded the contract as an entirety to be interpreted under English law.

Under English law, is the contract of August twelfth a mortgage or a sale? The consequences flowing from each are radically different. They are pointed out in the case of *Secretary for India* v. *British Empire, etc., Life Assur. Co.* (Court of Appeal, 1892, 67 L. T. R. [N. S.] 434), cited by defendant's counsel, and referring to the opinion of the lower court (affirmed on appeal) as follows: " In the case of *The Manchester, Sheffield & Lincolnshire Railway Company* v. *The North Central Waggon Company* (59 L. T. Rep. [N. S.] 730, 734; 13 App. Cas. 554), which was cited to me, Lord MAC-NAGHTEN says: ' As regards their legal incidents, there is all the difference in the world between a mortgage and a sale with a right of repurchase.'

" One of those great differences is that, when you have a sale with a right of repurchase, that right or privilege must be strictly followed to the letter, as is laid down in numerous cases, including *Joy* v. *Birch* (4 Cl. & Fin. 57; 10 Bli. N. S. 201). You are bound to comply with the letter of your contract in order to obtain that privilege which the deed has reserved to you on special and precise terms. On the other hand, a mortgage is construed against the letter. It is too late now to consider in any court whether that is a proper construction of the deed or not."

The plaintiff contends that even under English law, his contract is a mortgage of his paintings to secure a loan of £100,000 made by Widener. There must have been, therefore, an indebtedness to Widener to be secured. The existence of such indebtedness need not appear in the express terms of the contract (See *Lawley* v. *Hooper*, 3 Atk. 278), but the relation of debtor and creditor must be proved in some way, as, for instance, from the surrounding circumstances. These propositions are supported by many authorities. See *Gossip* v. *Wright* (32 L. J. Ch. 648) where the court said: " The court then determined this: that if the transaction between the parties, whatever be its form, whatever the language in which it is couched, or the machinery which was to carry it into effect, designed a loan of money and security for that loan, or a debt existing and a security for that debt; if that were the design of the parties, the transaction must be redeemable like any

mortgage, even although it be expressed otherwise." In *Williams* v. *Owen* (5 Mylne & C. 303) the court said: " If the transaction was a mortgage, there must have been a debt; but how could Owen have compelled payment? " In *Goodman* v. *Grierson* (2 Ball & B. 274) the court said: " The fair criterion, by which the court is to decide whether this deed be a mortgage or not, I apprehend to be this, are the remedies mutual and reciprocal? Has the defendant all the remedies a mortgagee is entitled to? I conceive he has not." The court then, after pointing out the futility of any proceedings to foreclose on the part of the defendant, said: " This appears to me decisive to show, that the transaction between these parties was not that of a mortgage, but a conditional sale; * * * "

In *Glover* v. *Payn* (19 Wend. 518 [1838] ) the court, after stressing the absence of previous dealings between the parties and that no debt was created by the transaction, said: " It is impossible to maintain, either upon principle or authority that this was a mortgage. If anything can be made of it but an absolute sale and an agreement to reconvey at the option of the vendor, it must be by proving facts which cannot be gathered from the face of the papers. Had it appeared that the deed was given to secure a pre-existing debt, or on a loan of money — that the consideration paid for the land was greatly below its real value, or that Payn was under obligation to pay the purchase money, there would have been a question, either at law or in equity, which does not now arise.

" On the facts disclosed by the bill of exceptions we can neither say that this was a mortgage, nor that the transaction was subject to any objection whatever.

" Delavan purchased and paid $7,000 for the property, agreeing at the same time to reconvey at a future period, on being paid $8,000. Payn, without contracting any obligation on his part, was entitled to any advance in value beyond $1,000; and Delavan, while he might profit to that extent, might also be a loser to a greater amount by a depreciation in the value of the property. Defeasible purchases are narrowly watched, and courts of equity always lean strongly in favor of the right of redemption. *Longuet* v. *Scawen*, 1 Ves. Sen. 402. Still it is well settled that an agreement to reconvey, either with or without an advance in price, will not turn an absolute conveyance into a mortgage."

The court further said (at p. 521): " But where there is no debt and no loan, it is impossible to say that an agreement to resell will change an absolute conveyance into a mortgage." (See, also, *Bascombe* v. *Marshall, No. 1*, 129 App. Div. 516; affd., 198 N. Y. 538;

*Arizona Copper Estate* v. *Watts*, 237 Fed. 585.)   In 3 Tiffany on Real Property (2d ed. 2387) the author says: " * * * and conversely, the fact that no indebtedness exists, which the conveyance can be regarded as intended to secure, is conclusive that it is not a mortgage."   (See, also, Williston Cont. § 772; *Conway* v. *Alexander*, 7 Cranch, 218, 237; *Haines* v. *Thomson*, 70 Penn. St. 434, 442.)

As already stated, the written contract makes no reference to an indebtedness to be repaid; but it provides that plaintiff might repurchase at the exact amount paid by Widener plus eight per cent interest from August 12, 1921, to the date of repurchase. Does this provision for interest necessarily indicate that the plaintiff was a borrower and defendant a lender?   It may be so, especially if the interest had to be paid at stated intervals and in any event. That is not the case here.   It was to be paid only if the plaintiff repurchased — an event which might never occur, depending almost entirely upon the possible restoration of plaintiff's estates in Russia. The question that would naturally present itself to Widener's mind on considering the possibility of a repurchase by the Prince would be, how he could be made whole in case Youssoupoff exercised his privilege to repurchase.   Naturally, he would expect to be reimbursed for the loss of the use of the £100,000, a considerable part of which he had borrowed, and also for the expense of bringing the paintings from England to Philadelphia, amounting to $11,000 expressage.   This position was a fair one for Widener to take and a natural one for Youssoupoff to expect and concede.

Viewed thus, the repurchase price is in fact £100,000 plus an amount measured by eight per cent per year on £100,000 for a definite period ending January 1, 1924, " and not thereafter." (Contract.)   And this conclusion finds strong support in the fact that the price to be paid by Widener on his repurchase was to be the identical amount paid by Youssoupoff, *i. e.*, about £120,000. The respective repurchases were to cost the respective parties identical amounts made up in the same way.   These arguments advanced by the learned counsel for the defense seem to me to lead naturally to the conclusion that the interest clause in this contract does not necessarily stamp it as a mortgage, and that in spite of that provision, it can be a conditional sale.   I do not find anything in the case of *Lawley* v. *Hooper* (3 Atk. 278; also reported in 26 Eng. Reprints [Ch.], 962), cited by the learned counsel for the Prince, that would lead to a contrary conclusion here.   In that case, although the Lord Chancellor thought the transaction must be considered as a loan, he did not place his decision upon that ground.   It so appears from the following

extract from his opinion: "Therefore, upon all the circumstances, I think this was, and is to be taken as a loan of money, turned into this shape only to avoid the statute of usury; but I do not think I am under any absolute necessity to determine this point, for I am of opinion, that this is such an agreement as this court ought not to suffer to stand, taking it as an absolute sale."

Another important fact to be considered in determining whether this contract was a sale or a mortgage, is the amount of the purchase money (£100,000) paid by Widener. If it appears that there was a great disparity between the value of the paintings and the amount paid, it would be a circumstance pointing almost conclusively to the fact that a mortgage was intended. And it is equally true that if £100,000 was a fair and adequate price under the circumstances here, it would just as strongly show that a sale was intended. "No one would lend upon mortgage the full value of the estate mortgaged; * * *." (*Neal* v. *Morris*, Beatty Ch. 597; also in *Conway* v. *Alexander*, 7 Cranch, 218; *Spering's Appeal*, 60 Penn. St. 199; *Haines* v. *Thomson*, 70 id. 434; *Holmes* v. *Grant*, 8 Paige, 243, 258.)

It should be borne in mind that the question here is, the adequacy of £100,000 as a purchase price on August 12, 1921, giving due weight to the fact that the title acquired by Widener might be divested by the exercise of the defendant's right to repurchase under certain conditions named in the contract. In other words, Widener, a private collector of rare paintings, might have to give up his ownership of these portraits in compliance with the terms of his purchase. Obviously, adequacy of consideration under such conditions would be quite different from adequacy where the sale was unrestricted and the title free. In the latter case the fair value or the market value would be greater than in the former. We realize the difficulty of satisfactorily determining the value of these works of art, even with the aid of the capable and distinguished experts called here to testify, and who, themselves, frankly admitted the inconclusiveness of their expert opinions on the subject.

However, counsel having done the best that could be done to assist the court in determining this question, the court will consider this testimony and draw the conclusions which it see s to warrant. Sir Joseph Duveen, called by the plaintiff, testified that in February, 1921, after six months of negotiations, he offered £150,000 for the paintings; that this was a period of great depression; that it began in January or February of that year and gradually grew worse and was very bad in the summer of that year. It should be noted here that Duveen's offer was made for an absolute

sale unhampered by any privilege of repurchase granted to the seller. The plaintiff refused this offer because he believed the price to be far below the value of his paintings, his price at that time being £200,000. Later, however, on December 21, 1922, although market conditions had improved, he made a definite offer to Ruck to sell him the portraits for £140,000. (Exhibit 20.) Duveen's offer was made and refused six months before the Widener contract was signed.

Mr. Agnew testified that a bad depression in the picture market existed from the summer of 1920 towards the end of 1922 and that the depression was deepest in 1921, because there were very few collectors buying pictures at that time and dealers were not keen to buy. He also testified that in his opinion £100,000 was a very fair price for these paintings in the summer of 1921, and that, although his firm had offered £100,000 for them in 1909, it would certainly not have given that price in 1921 and would not have given more than £90,000. Mr. Scott testified to the same effect and also that Mr. Widener was the only man he knew of at that time desirous of buying great works of art. He also testified that the market value of the paintings in the summer of 1921 was £100,000 and that their market value at the time of the trial was no more.

Mr. Valentiner and Mr. Friedlander testified to the same effect, to wit, that £100,000 was a fair and adequate price for the two Rembrandts in July and August, 1921. What the opinions of these expert witnesses would be as to the value of the paintings, assuming the sale to have been made subject to the right of plaintiff to repurchase them at the same price, does not appear. It is reasonable to infer, however, that such a limitation upon Widener's ownership would have led them to lower their estimate of market value.

It is suggested that the experts failed to give due weight to the great intrinsic value of these Rembrandts. They did not attempt to state that value in terms of money. Intrinsic value can hardly be measured in that way. The most that could be said is, that their intrinsic value or merit is very great. A medallion by Benevenuto Cellini would, as an object of art, have an intrinsic value into which would enter the genius shown in the conception of the design, its beauty and the marvelous skill in execution which made his work of an excellence unsurpassed. These attributes are inherent in the object itself and we say they indicate great intrinsic value, but they do not measure their money value. The intrinsic merit of a work of art may establish a reputation for it, and so create a demand for it. When that happens, a market value is made for it, and that, I think, is the only kind of value which concerns us in this case. It seems to me that the expert witnesses

as to value must have assumed the great intrinsic value of the paintings in estimating their market value.

It is my opinion, therefore, that the price paid by the defendant was adequate and fair under the conditions existing in August, 1921, when the contract was signed. Confirmatory of this conclusion, is the testimony of Valentiner as to the prices at which Rembrandts of the same class as those in suit were sold in the period between 1909 and 1923. To mention one transaction, the sale to Mr. Altman in 1909–1910 for £108,000 of the two portraits known as " Man with Magnifying Glass " and " Woman with a Pink." (See Minutes, pp. 830–841.)

It may be asked why, if £100,000 was the fair market value of these paintings, as I think has been shown, Widener was willing to give the plaintiff in addition to the £100,000, the valuable right to repurchase at the same price, and why plaintiff was willing to accept that amount as the purchase price, believing as he did, that £200,000 was their real value. A reasonable explanation may be found in the following facts: Mr. Widener refused to make a loan; the parties had widely divergent views as to the value of the paintings; the Prince had a very exigent present need of £100,000; he was sure that conditions in Russia would change to such an extent that the restoration of his Russian properties before December 31, 1923, was a certainty, enabling him to repurchase the paintings on or before that date. And as Mr. Widener did not share the optimism of the Prince, he was willing to take what seemed to him the very slight risk of ultimately losing the pictures, and so agreed to the repurchase clause of the contract.

It is my conclusion from all of the foregoing considerations that, under the law of England, the contract here is a sale with a conditional privilege of repurchase, and not a mortgage.

The contract of August 12, 1921, first provides for the sale of the Rembrandts to defendant. Then follows the privilege to repurchase granted to plaintiff. This privilege is qualified; the plaintiff agrees to exercise it " only in case he finds himself in the position again to keep and personally enjoy these wonderful works of art." He also agrees that in case of a repurchase by him, he will sell them back to Widener at the gross sum he paid to Widener, if at any time within ten years after his repurchase, he or his representatives should wish to dispose of them. Thus the plaintiff's right to repurchase is conditioned, *first,* upon his payment of a stated sum on or before December 31, 1923; and *second,* upon his being at the time of the repurchase financially able to keep and personally enjoy the paintings. In my opinion these are valid conditions, and must be complied with strictly by plaintiff before

his right to repurchase is perfected. The first condition has been met by his tender of the stipulated repurchase price of $520,000. But has he fulfilled the other condition? On the 31st of December, 1923, was he in " the position again to keep and personally enjoy these wonderful works of art? "

It appears that in an attempt to raise money to repurchase the portraits, the plaintiff, with his friends Maziroff and Adjemoff, approached Gulbenkian, a well-known collector of art objects, who ultimately loaned the plaintiff the money to make the repurchase, and which was afterwards tendered to defendant. At this time the plaintiff's financ'al affairs were at a very low ebb. This conclusion is confirmed by the testimony given by his business man, Maziroff, in describing the interview with Gulbenkian. According to this witness, Adjemoff said to Gulbenkian: " You know that the Prince is in a very critical condition, he needs help to redeem his pictures." (Maziroff, p. 445, minutes.) On his cross-examination Maziroff, when asked if Adjemoff's statement was true, said it was absolutely true. (Minutes, p. 531.)

The plaintiff testified at length and in detail as to the value of his property including precious stones, bank deposits, mining properties in Russia, etc., and a country home in Switzerland. Notwithstanding this testimony, much of it extremely vague, almost all of it his own estimate of values, and some of it dealing with probabilities and possibilities of realizing upon it at some time in the future, I think we must conclude that at the time of his tender he was so weak financially as to be unable to raise the money required to repurchase the portraits, except through the loan from Gulbenkian secured by a pledge of those very pictures. The loan of $551,275 was made and the pictures were pledged as security therefor under date of December 13, 1923. (Exhibits 23 and 24.) The note (Exhibit 24) reads in part: " On or before December 13, 1924, without grace, for value received, I promise to pay to the order of myself the sum of five hundred and fifty-one thousand two hundred and seventy-five dollars ($551,275.) at * * *." Then follows: " To secure the full and prompt payment of this note, I hereby transfer and deliver to, deposit and pledge with, the holder hereof two certain original oil paintings by Rembrandt * * *." The note also provides that upon default in payment the holder may sell the two oil paintings or either of them at public or private sale, for cash or on credit, and without notice of any kind whatever to the plaintiff, all matters of that kind being waived and dispensed with by the plaintiff. Then follows the provision, " and upon any such sale or sales the holder hereof is hereby authorized to become the purchaser and absolute owner of said

oil paintings, or either of them, or interest therein, free of any claims, trusts and rights or equities of redemption." By its terms this note with the security is made absolutely negotiable. In this way Gulbenkian was secured for his loan of the $551,275 deposited for the repurchase of the paintings.

Whatever sources the parties had in mind for the raising of money to make the repurchase, it is quite certain that a pledge of the very portraits themselves in case of need was not among them. Such a method has many of the earmarks of a device born of the extreme necessities of the plaintiff's situation at that time.

Rather they had in mind a financial rehabilitation through a restoration of plaintiff's confiscated estates in Russia. Such an event would enable the plaintiff to repurchase, keep and personally enjoy his heirlooms. I do not say that money from other sources would not fulfill the condition of repurchase; but good fortune in Russia, long hoped for and confidently expected, was to furnish the means to enable the plaintiff to repurchase.

Defendant urges, and I think with reason, that the second above-named condition referring to Widener's right to repurchase implies that plaintiff will not sell the pictures or otherwise place them in circumstances rendering it impossible for him to keep his agreement to resell to Widener within the ten years' period. It is obvious that by his pledge to Gulbenkian he has made it possible, if he should fail to pay his note, for the portraits to pass into the ownership of a buyer without notice of Widener's rights and thus make those rights valueless. And, in view of the plaintiff's necessitous condition, I think it is practically certain that ultimately the portraits would become the absolute property of some *bona fide* buyer without notice of Widener's rights. And the Prince will have lost his ownership, rendered himself incapable of performing this condition of his contract, and Widener would have no remedy worth the seeking. Widener stipulated for possession of the pictures in case the plaintiff wanted to sell them. The latter's pledge of them was an expression of his willingness to have them sold in case he failed to pay his note. It was of the same nature as the plaintiff's written offer of December 21, 1922, afterwards withdrawn, to sell the paintings to Ruck for £140,000. (Exhibit 20.) Both acts evidenced a disregard of his contract obligation to the defendant.

Therefore, because the conditions upon which depended the plaintiff's right to repurchase have not been compiled with, I find that the plaintiff is not entitled to a specific performance of this contract as prayed for, but that defendant should have judgment dismissing the complaint on the merits. The disposition of the proposed findings and conclusions of law will be filed in due course.